JiKLIEBERT, Chief Judge.
Norman P. Billiot instituted this action against his former employer, Momar, Incorporated, alleging Momar breached their employment contract resulting in a variety of pecuniary and nonpecuniary losses. Momar reconvened seeking $3,731.79, the amount Billiot’s monthly draw, expenses and loan balance exceeded his earnings during their approximately eight month relationship. Following a bench tria1, the court rendered judgment in favor of Billiot concerning his demand in the amount of $3,184.65 for costs associated with the birth of his child, but rejected the remainder of his demands. Additionally, the court found Billiot’s total draws, share of expenses and loan balance exceeded his earned commission and was thus indebted to Momar for $3,731.79. Legal *364 interest was awarded to both parties from the date of judicial demand. Only Billiot appealed. For the reasons that follow, we affirm.
On appeal, Billiot assigns three errors. First, the trial court erred in failing to hold a letter dated January 30,1985 from Momar to prospective customers “... constituted a post contract written admission of a contract obligation and additional consideration for the execution of a written employment agreement ...” which was breached and relied upon by Billiot to 12his detriment. Secondly, the trial court erred in refusing to find the failure to pay a contracted draw was a breach of the employment agreement. Thirdly, predicated on the above two errors, the trial court erred in failing to find the above contract breaches were in bad faith entitling Billiot to damages, whether foreseeable, unforeseeable, pecuniary or nonpecuni-ary.
Norman Billiot was a chemical salesman with Malter International for approximately ten years. He resigned from Malter and, on January 7, 1985, signed an employment contract with Momar, Inc., a competitor of Mal-ter. The terms of employment were memorialized in Momar’s standard employment contract with one deletion and two additions. The parties agreed to delete from the written employment contract paragraph 8, a non-competition agreement. Two provisions were added and memorialized in a January 2, 1985 letter: First, Momar would continue Billiot’s present insurance and pay 100% of the premiums for the period of his wife’s pregnancy. Second, a bonus schedule was set forth over and above Billiot’s commission rate. The pertinent provisions of the employment contract, as amended with the addition of insurance and bonuses, follow:
4. Company will advance to Salesman a drawing account of Three Thousand five hundred ($3,500.00) Dollars per month, all of which sums shall be credited to Company in computing the compensation of Salesman under this Agreement; said sums shall be strictly a drawing account and not a guaranteed minimum salary or compensation; said drawing account shall be a debt of Salesman to Company, payable upon demand by the Company. Company may from time to time revise the amount of drawing account to be advanced to Salesman without affecting the other terms, provisions and conditions of this Agreement.
5. There shall be an annual accounting between Salesman and Company as of the close of the fiscal year of Company (which presently falls on the Friday nearest the 1st day of November each year); said accounting to be made by December 31. At said accounting there shall be credited to Salesman the amounts of commissions earned by him during said fiscal year and there shall be charged against Salesman all drawing account funds paid to him during fiscal year. There shall also be charged against Salesman all commissions previously credited to him on sales made by him, which on said fiscal year-end have not been paid for by the customer to Company within sixty (60) days after date of shipment; provided, however, in lieu of said commission charge to Salesman, Company may, at its option, in such annual accounting, charge against Salesman a sum equal to 23% of the aggregate of all accounts more than 60 days past due as of its then current fiscal year-end. All other proper charges and ^credits consistent with Company policy shall be taken into account in said annual accounting. If this accounting results in a net credit due to Salesman, the amount of such credit shall be paid to him within 75 days after the fiscal year-end.
* * * * * *
9. Company and Salesman shall share equally the cost of advertising material and items provided to Salesman by Company upon the request of Salesman.
10. The cost of the complimentary advertising, such as sales promotional material and items, school and college annuals, hotel telephone directories and house organs, shall be shared equally by Company and Salesman, provided, however, that the consent of Company to such complimentary advertising shall be first obtained.
11. All transportation charges on merchandise to or from a customer, which *365 transportation charges are borne by Company (insofar as the customer is concerned) shall be shared by Company and Salesman, in accordance with the written policy in force for all salesmen. Said policy is subject to change from time to time, to be effective upon the providing of a copy to the Salesman.
12. This Agreement and the rights and obligations of all parties hereto shall be governed by the laws of the State in which the territory described in Paragraph 1 is located, (if more than one State, the State of Salesman’s domicile).
13. This Agreement covers all of the terms and conditions of the relationship between Company and Salesman; all other understandings, agreements, contracts or promises, whether made prior to, simultaneously with or subsequent to this Agreement, unless in writing and by way of amendment hereto, are null and void, the entire agreement of the parties being contained herein.
The January 2, 1985 agreement added the following provisions:
As agreed, we will contact your present insurance carrier and make arrangements to carry a policy (in addition to the Momar insurance you will be joining) for the period of Pamela’s pregnancy. Momar, Incorporated will be responsible for 100% of the monthly premium for the continuance of this policy. Of course, as soon as your child is born, Momar insurance takes over and the secondary policy will be terminated.
You will receive a $500.00 bonus after you have written $25,000.00 in volume (any combination of Momar-Lubest-AquaTrol products). You will receive an additional $500.00 bonus for each additional $25,-000.00 volume that you write through $125,000.00 your first year. These funds will be paid to you as you reach each $25,000.00 level as outlined below:
At $ 25,000.00 in volume — you will receive $500.00.
At $ 50,000.00 in volume — you will receive $500.00.
At $ 75,000.00 in volume — you will receive $500.00.
At $100,000.00 in volume — you will receive $500.00.
At $125,000.00 in volume — you will receive $500.00.
Total bonus to be paid for writing $125,-000.00 with (sic) then equal $2,500.00.
UBilliot contends the written employment contract was modified by assurances from Bill Buckley, the Momar Vice-President who hired Billiot, that Momar would produce any chemical compounds needed to satisfy his customers, i.e., special product manufacturing. In support, Billiot offered a letter dated January 30, 1985 from Buckley to four of Billiot’s former Malter customers which included the following paragraph:
Having been in business since 1947, it was relatively easy to assure Norman that the quality of the [Malter] products would continue. In fact, if a product in our current line did not suit his customer’s needs, I assured him that we would — as a leading manufacturer of maintenance chemicals, lubricants and water treatment products in the Southeast — make whatever was required to get the job done. By the way, I’m happy to report that special product manufacturing has not been necessary to this point. Norman has been able to find comparable products for all of his customers from among our regular line of some five hundred different chemical compounds.
Billiot testified Momar breached their employment contract by failing to perform “special product manufacturing” which resulted in lost sales. In particular, Billiot claims Momar’s inability to match a particular product need by his customers resulted in the loss of numerous customers and the following concomitant damages:
Loss of Potential Income
Loss of Commission on Possible Sales
Cost of Refinancing Family Truck
Monies Spent to Prevent Foreclosure of Family Residence
Ruination of Credit Rating
Loss of Reputation.
Further, Billiot claims Momar breached the employment agreement by reducing his *366 monthly draw and not paying agreed-on bonuses. Finally, Billiot claims the employment agreement was further breached by Momar’s failure to pay hospital bills which resulted in the loss of hospital privileges.
The trial court found the employment agreement and the January 2, 1985 letter concerning insurance and bonuses comprised the entire agreement between Momar and Billiot. Billiot’s attempts to expand the contract to include vague and undefined promises to require Momar to produce whatever chemical compound that a customer may need was rejected.
| sThe meaning and intent of the parties to a written contract which is clear, explicit, and leads to no absurd consequences must be sought within the four corners of the instrument. Bonfanti Marine, Inc. v. Clement, 439 So.2d 537 (La.App. 1st Cir.1983); McClelland v. Security Industrial Insurance Co., 426 So.2d 665 (La.App. 1st Cir.1982), writ denied, 430 So.2d 94 (La.1983). Parol evidence may not explain, vary, add to, or subtract from the writing. Ashley Enterprises, Inc. v. Esplanade Plaza Co., 425 So.2d 1010, 1012 (La.App. 5th Cir.), writ denied, 432 So.2d 270 (La.1983); Campesi v. Margaret Plantation, 417 So.2d 1265, 1269 (La.App. 1st Cir.), writ denied, 422 So.2d 163 (La.1982); Mathieu v. Nettles, 383 So.2d 1337 (La.App. 3rd Cir.), wrii denied, 390 So.2d 202 (La.1980). Momar and Mr. Billiot, in fact, memorialized in the Employment Agreement their belief that it constituted their entire contract:
This agreement covers all of the teims and conditions of the relationship between Company and Salesman; all understandings, agreements, contracts or promises, whether made prior to, simultaneously with or subsequent to this Agreement, unless in writing and by way of amendment hereto, are null and void, the entire agreement of the parties being contained herein.
As a party to a written contract, Mr. Billiot is presumed to know and understand its contents. McClelland, 426 So.2d at 671.
Billiot contends on appeal that special product manufacturing was the consideration that induced him to leave Malter and that Momar knew of this consideration. Further, he contends the January 30, 1985 letter constituted a stipulation for the benefit of a third party, by benefitting his customers and himself with increased sales.
Trial testimony showed Billiot’s decision to leave Malter was related to numerous differences of opinion with Malter management practices. The trial court rejected the idea that special product manufacturing was a promise which induced Billiot to leave Mal-ter. This conclusion is supported by the fact that Billiot negotiated changes in Momar’s standard employment agreement and reduced the changes to writing. Nowhere does the agreement reflect that special product manufacturing was part of the agreement.
| GBilliot’s attempt to interpret the January 30,1985 letter as a stipulation pour autri also cannot stand. A reading of the letter shows it to be unquestionably a sales letter, touting Momar and Billiot’s abilities in hopes of converting customers. This fact was confirmed by Buckley’s testimony, the author of the letter, and mailed only to the four accounts Buckley visited with Billiot.
Thus, we find no error in the trial court’s conclusion that special product manufacturing was not a part of the contract between Billiot and Momar.
Billiot’s second assigned error contends Momar breached its employment agreement by reducing his monthly draw.
Bill Buckley testified on behalf of Momar concerning Billiot’s hiring, his performance and the payment and billing practices between Momar and its salesmen. He testified that the salesmen’s monthly draw is an advance against sales commissions earned. This fact was supported by the employment contract and the testimony of Billiot. Further, Buckley testified the $3,500.00 draw was based on Billiot’s assertions that he would make annual sales of $150,000.00. It was later learned that Billiot had not made annual sales of $150,000.00 in the few years prior to 1985 or through the date of trial. Because Billiot was not making the necessary sales to support a $3,500.00 draw, the second February draw was reduced which still left Billiot drawing $1,060.26 more than he *367 earned for the period January and February 1985. Billiot maintained the reason for low sales was lack of support, including the refusal to perform “special product manufacturing” by Momar. Momar contends the low sales volume was directly related to the unusual sales habits of Billiot. According to Momar and its witnesses, a salesman should call on 8-12 customers or potential customers per day and should focus on selling their particular product. During Buckley’s four day sales trip with Billiot in early January 1985, Billiot called on six individuals representing four accounts. During these calls, Billiot failed to demonstrate or focus on selling Momar’s products, but instead engaged in a general visit ^discussing a variety of matters often unrelated to Momar’s products. Because sales remained low, Momar sent two individuals to assist Billiot, James King, the head of Momar’s lubricant division, and Richard Wong, like Billiot, a former Matter salesman. Both men met separately with Billiot and both confirmed Buckley’s opinion that Billiot was not making a sufficient number of sales calls and, on the calls he made, he did not focus on selling Momar products. These visits were attempts by Momar to boost Billi-ot’s sales by giving him some direction. Mo-mar’s suggestions to Billiot fell on deaf ears.
As stated in the employment contract, Paragraph 4, the drawing account is not a minimum salary but a debt of the salesman to Momar to be credited by Momar against commissions earned. Additionally, Momar had the right to revise the amount of the draw allowed to a salesman at its discretion. Accordingly, we see no error in the trial court ruling that Momar did not breach the employment agreement by reducing Billiot’s draw. Further, because he did not reach sales of $50,000.00, Billiot was not entitled to the second $500.00 bonus.
Because we find no breach in the employment agreement by Momar, Billiot is not entitled to damages as argued in assigned error three. Further, Billiot does not contest the award in favor of Momar. Therefore, that portion of the judgment is final.
For the foregoing reasons, the trial court judgment is affirmed. Each party to bear their respective costs.

AFFIRMED.